464, et al. Petitioners v. Federal Energy Regulatory Commission. Dan Sponseler for the petitioner. Mr. Fulton for the respondent. Good morning. Good morning, Dan Sponseler for the petitioner. This morning, I'd like to identify the key feature in this case and then discuss the errors by FERC in approving the orders which require vacating and remanding of those orders. And you'll start with the jurisdictional question of your standing? Your Honor, yes. The standing is Mr. Clark, the president of the union, is a customer in the New England ISO electric area and bears the cost of the increases that were caused by the withholding of Brayton Points and that were approved by FERC in this case and thereby making them collectible to be imposed on him. So I see where you made those assertions in your protest. And that's the only reference you've given us. Is that correct? Those, yes, Your Honor. In our protest, that is where we refer to it. That's a matter that is undisputed by anyone and undisputed by FERC. What is undisputed? That he is a customer that would bear the burden of the price increases that are at issue in this case that resulted from The, I believe FERC argues that the standing is based on the assertion that the withholding caused the price increase that is ultimately going to be borne by Mr. Clark and the union evidence and allegations in this case that the withholding did cause substantial price increases in the auctions. And I will find that by looking at your protest because I looked at the part of your protest that you cited. That's one. Then the second sort of Your Honor, the conduct of the withholding of the plant constituted market manipulation. Those are assertions. And the purported retirement of the plant was therefore invalid. That is the central issue in this case. And the retirement, even though it happened before FCA 8, the withholding of that power caused the increase in FCA 9 and the increase in FCA 10 and was equally acts of market manipulation which would render the results of FCA 9 and FCA 10 from those increased prices unjust and unreasonable. And FERC failed to give reasoned decision making as to why those were unjust and Help me understand a little bit more. The connection you draw between the core challenge which is the withdrawal of capacity in FCA 8 and the challenges before us to FCA 9 and FCA 10. Is the claim of manipulation with respect to FCA 8 dependent on the fact that the retirement decision came after the deadline for other potential capacity providers to participate in FCA 8? Yes, Your Honor. That implemented and allowed the manipulation. But so, given that, when we look at FCA 9 and FCA 10, there was no similar manipulation because by the time FCA 9 was pending, everyone who, all the potential capacity providers were fully on notice that this facility was being retired. And so, I'm just trying to FCA 9 and FCA 10 was manipulated if the timeline was not so affected as it was with FCA 8. It's useful to look at the overall picture here which is the owners came in and the Brayton 8 and in the future because of the supply situation. And it was by withdrawing that capacity from all of the auctions. There were different mechanisms. The first was FCA 8, but it was equally withdrawn from FCA 9 and FCA 10 by the Energy Capital Partners conduct. So, by knocking the Brayton Point plant out of the supply stack for both of those auctions, that caused the dramatic increase in the price. So, that's the relationship. It is the withholding of Brayton Point from the auctions. How long does that go forward? How long does that continue? Forever? Would that apply to Auction 12, 13, 14? Brayton Point is gone presumably for good. So, every auction going forward is tainted with the same problem? Your Honor, that's a good question. And how far that goes, I think is perhaps unclear. But I would suggest the answer to that is that when FERC reviews these auctions and when it is clear that an immediate or a very recent withdrawal was made, which would clearly increase prices, and it's not just in one year. It's going to carry on for the future years. And FERC, as part of its reasoned analysis, needs to determine whether this withholding by a major player who came in and bought up a competitor and knocked it out of the supply stack and reduced supply to drive up prices and drove up all of the profits on its other units, whether that was an act of manipulation, intentional manipulation of the market. And I would suggest that FERC needs to look at that in each case. And I can't give you a precise answer. Mr. Sponseller, is your short answer that that would be a factual question to be determined by the Commission on Remand? In other words, what the scope of the impact of what you claim was unlawful manipulation? Yes, Your Honor. Would that have to be dealt with by economists projecting through time to figure out how long, if it were, in fact, manipulation, how long the tail of it was? Yes, yes. I think it would be a fact issue. There must be another auction going on right about now. Are you claiming injury? Is your client claiming injury in this one? Your Honor, that's FCA 11. We are not. We have borne a tremendous burden with FCA 8, FCA 9, and FCA 10. It was clear that there was going to be a substantial, now $3 billion increase in those three auctions. And the increase and the effect of that has tailed off. And it's not clear that it's affected 11 and 12, although I suspect there has been some impact. But our client has done enough by objecting to these three. But your theory of standing would continue at least into 11 and 12, and you said there's still some impact. If there is an impact as a result of this withholding by one of the major players to increase its profits, we would have standing to object to those. Can you just explain? Although we haven't, and I believe the time has passed probably for FCA 11 to file the objections. I'm just questioning about the theory of standing that you have. Can you just explain to me how – you have to show by a substantial probability that there is causation in this situation. It's not just alleging it like you would have a complaint. What is the basis for your conclusion that whatever you say went wrong in auction eight carried forward into auction nine? Because at least when you go through the tariff and the way ISO sets up the sort of variables that are going to be in play in the next auction, none of that seems to depend on prior or existing price the year before. That's just not a factor as it sets up the parameters for the next auction. And quite frankly, if you get a really high price in auction eight, that might well attract a lot more people in. So just as a factual matter, it should attract a lot more competition in the next one, which would actually drive prices down. So what is your basis for saying that it carries forward given how independently the auctions are designed? Yes, Your Honor. The key point for each of the auctions is the withholding of Brayton Point from the auction stack has a clearly discernible impact on what the resulting auction clearing price is going to be. And we had an expert that identified – and I can explain exactly how that happens if it would be useful, Your Honor. What I'm trying to figure out is like Brayton is out, but a whole bunch of – assume other people come in to fill that hole because now prices are much higher. They're much higher in auction eight, so they figure there's a real need now for our capacity. So they come in, but then you actually have more competition than you might have even if Brayton Point had been there. But keeping Brayton Point out, because of the way this particular auction works, in each case drives the resulting clearing price up. And the reason for that is that each of these auctions is done in a very sort of unique way for this market. All of the generator bids are stacked in order of their cost from lowest to highest. And they all get submitted until they get enough quantity to meet what the demand is going to be. And the whole game, if you are a generator and you want to get the prices up, you want to knock out one of those generators in the supply stack. And in this case, Brayton Point was a critical generator. And whenever you knock that generator out, that goes out and it brings in a higher cost generator to be the marginal generator. And if I could just finish, Your Honor, one thing. And the key feature of this auction is it's that marginal cost of that last generator needed to meet the demand that sets the clearing price for the whole group of generators. So these other generators that are already in there, which was these Energy Capital Partners generator units, they wanted to drive this price up as high as possible because it jacked up their prices, because the clearing price was so high. And it jacked up their prices by almost $200 million as a result of... You're talking about Auction 8. I'm talking in Auction 8, it was $100 million. In Auction 9, it was about $75 million. In Auction 10, it was about $25 million. Just for Energy Capital Partners in additional profits from knocking this price up, knocking Brayton Point out, and knocking this clearing price up, so that it would be higher in all of Energy Capital Partners' generation. How do we know that the new capacity that's coming into the auction is at a higher price point? It could be lower. Your Honor, the people in the market know, the industry people know what the costs are of the existing generators and of the potential people that are out there, the types of plants. So let me get back to my basic concern here. When the objection was raised, you have the burden to show standing, and the opening brief presented it in terms of we're paying higher rates. So then the commission raised the objection, and in your reply brief, I would have anticipated that a lot of what you're telling us today would have appeared. So what I hear you telling us today is, one, if I read the record of auction 9 and 10 thoroughly, I will understand everything that you have said today. But there are some things you're saying today that I could not find when I first looked, and maybe that's just because I don't understand the Northeast system well enough. But it's your burden to give me or give the Court the path for finding standing, and it's the causation part that we've been focusing on this morning. And you say everyone knew, et cetera, and the commission has raised a number of issues, and absent your citing us to something in the record, since we're not making a fact-finding here, I'm having trouble understanding how you think we can resolve these matters in your favor, absent your presenting something to us. I acknowledge that for purposes of standing, we will take your assertions or factual proffers as true, but I just didn't see the types of things you're telling us today. Well, Your Honor, in our opening brief, we did identify the price increases. No question about it. And I see the chart, and I see some other things, too. But you're telling us things today that I didn't see, and maybe that's because I don't know about the Northeast tariff, all right, and how that works. But that's what you have to show us. I mean, just being a rate payer isn't enough. Well, Your Honor, I think the essential features are that the indications and the proffer of the price increase allegedly resulting from the manipulation is in our opening brief. Where do you get your figures? There's a lot of figures in your brief, and you mentioned some today. What are you citing to in the record? Where do we look in the record for the basis for both the impact on the market as a whole and for the takeaway to capital energy partners? The impact on the market as a whole, Your Honor, in the FCA8 proceeding, the union had an economic expert analyze the market and calculate what the impact price increase was as a result of knocking out Brayton Point and driving the clearing price up. And that was supported by an affidavit and explained. And he did the same, and that's in our FCA8 protest, which I know that we cite here, the original protest. We cite it, but we did not include it in the appendix. And I think it would be useful if we supplemented the appendix. FERC is aware of this, and the pages are referenced in there. All right, so we have authority here that you're supposed to make all this clear to us in your opening brief or at least in your reply brief. But our case law is that if your standing is self-evident, we can proceed. But obviously from our questions, I think it's clear it's not self-evident to us. So under our American Library Congress case, we have allowed a petitioner to submit an affidavit spelling out the basis, the three prongs of standing, and maybe that's what is needed here to take us through this. Because now you're telling us that really what we need is information that's not even in the record before us, namely your protest as the auction aide. Your Honor, we would be pleased to do that, and we'd appreciate the opportunity to do that, because we clearly can. All right, and let me say from your brief, you cited us to the agency cases. And, of course, Article III of the Constitution does not apply to the agency. So you're faced with the burden, once you come into an Article III court, to meet the Article III standard. So I'm just mentioning that so any supplement you file meets that standard. I mean, the agency can proceed without worrying, and your motion for intervention is trying to say why you had an interest and you viewed yourself as a party agreed, but that's different. Your Honor, we would be happy to do that. But, Mr. Sponsor, you had also mentioned, I'm sorry to interrupt you, but I just want to make sure that I know your answer to this. You had also mentioned that you had done a similar analysis with respect to the effect of the alleged market manipulation on FCA 9 and FCA 10. Are the figures or the data underlying those estimates in the record? The results of the estimates are in the record in the FCA 9 and FCA 10. Those quantifications were done by the same expert. And is that talking about Paul Chernick? Paul Chernick. However, we did not submit additional affidavits by him confirming that, although he clearly would confirm it. He did the analysis in part, Your Honor, because this was never challenged in the FCA 8 because the fact of the price increase from knocking out Great and Point, it was known that this would happen in the industry. It was reported. I think we're really focused on 9 and 10 here. So showing what was going to happen in Auction 8 doesn't help us. And so what we need is, I mean, you're welcome to submit information that was part of your FCA 8 protest, but I don't see how that is going to show anything about how an auction a year later was affected. And are you telling me that when you say this expert confirmed causation, was that part of the record or just something outside between you and your expert? Is that something you can submit? It's something we can submit, Your Honor. It's not part of the record before FERC? No. The assertion was there. It was undisputed by FERC. There was no evidence to the contrary in any dispute. What was undisputed? In Auction 9, they very much dispute this causation point in Auction 9. I don't think you can say that it's been undisputed that what happened, Brayton Point's withdrawal caused price increases in Auction 9. Your Honor, I should say they put in no evidence showing that the withdrawal of Brayton Point had no impact. You had the burden to show, though. This is your burden. And the tariff itself, the elements that they used in setting up the next auction are all independent of whatever price may have existed beforehand. So I don't see mechanically how that price increase that happened for Auction 8 was carried forward into Auction 9. I just don't see that in the tariff. Your Honor, Mr. Chernick did an independent analysis in Auction 9 and in Auction 10 to calculate what the price impact would be. And that's the number that he gave us, and we included it. Clark hasn't had any chance to see that. The number's in there, but Mr. Chernick's affidavit is not in there. When you say the number's in there, where do we look for the number? For the evidence that the shutdown increased prices, in our brief, it's pages 7 and 8. Your brief to us? In our opening brief to this Court, at pages 7 and 8, and footnote 2 particularly on page 8. So those numbers are just repeated in your protest without any citation of their source. So all we have is numbers. There's no evidence behind these numbers. Your brief cites to your protest, and your protest just puts the numbers out there without saying anything about where they came from. That's correct, Your Honor. As I've said, these numbers were provided by Mr. Chernick, and it was on an affidavit. The affidavit was part of your protest? Attached to the protest? He did have an affidavit attached to this protest, FCA 8, regarding the impact on FCA 8. He then did, in FCA 9, another analysis, but we did not include an affidavit supporting that. But he easily can and would. And he did the same thing again in FCA 10, and that's what's in the record. Just before you sit down, Ferg argues that there was no requirement at the time of FCA 8 that the Commission examine the economics of a retirement request, and that even if it had it, there's no mechanism, had it found that it was going to have a detrimental impact on the competitiveness of the market, that there was no mechanism by which it could have forced Brayton Point to continue to operate. And what are your responses to those points? I'm sorry. Your first question, Your Honor, was? That there was no requirement that the Commission examine the economics of a proposed retirement. Your Honor, in order for the Commission's order to be based on reasoned decision-making, under these circumstances, they had to examine whether the shutdown of this plant was economic. Because it's market manipulation. If somebody shuts down a key pivotal plant to jack up prices for their other units, and it has a significant increase, and you have to examine that. And very importantly, FERC later, ISO New England later acknowledged this when they did the retirement reform proceedings. They realized that with these retirements of pivotal plants, you've got to look at the economics of the shutdown, because it has the potential for huge manipulation, and they have a whole, they then adopted a proceeding for it in the retirement proceedings. And as you know, FERC comes back and says, fine, we have a new tariff that has new and more stringent requirements for capacity that proposes to retire, but that doesn't apply retroactively to invalidate what was done in FCAA. Your Honor, what it acknowledges, though, is that in order for the results of auctions where there are these retirements to be just and reasonable, one has to examine the costs and the economics of doing it. And are the economics alone evidence, in your view, of market manipulation? It seems like there's sort of three different concepts that are somewhat conflated, and it may be because, at least in your view, they are, in fact, the same. One is continued profitability, the second is market power, and the third is market manipulation. Can you clarify what you're relying on? Yeah. There really are three elements to market manipulation here, and one is the economics of the plant. But the indicia are, first, when you have a fleet owner that goes in and buys another generation plant that is pivotal and knocking it out will increase prices. You have a fleet owner that buys a plant, withholds it from the market, and there's a resulting price increase. There is a resulting substantial increase to the fleet owner's other generation units, so that he's now jacking up the price to make money on these other units. And the plant could be run economically. So the economic aspect is an essential feature of the elements of the indicia of the market manipulation. And FERC, what would FERC do? I mean, you can't force a business that doesn't want to operate to operate. So had this all been dealt with promptly in real time during FCA 8, what was the appropriate response? The energy capital partner says, we don't want to do Braden. Maybe we've just had a change of heart. This is cold. This is outmoded. Let's get rid of it. And they just want out. Then what should FERC have done? They could have done exactly what they finally realized they should have done in the retirement proceedings. Using proxy pricing. Which is use a proxy. And did they have authority to do that before the new tariff? Absolutely. As part of their mandated review under FPA Section 205 to make sure these prices were just and reasonable, which was an essential part of the settlement that is also an essential part of the tariff, they could absolutely make that change. What do you point to as best authority that they could do the proxy pricing without having that be codified as one of the elements of their authority under the tariff? I would point to Section 205, which requires that the results of these auctions and that FERC and that the burden is on the ISO to show that these results are just and reasonable. And where you have a retirement like this and all the evidence of manipulation, the ISO hasn't met the burden of showing that these are just and reasonable. Regardless of what the tariff is, the anti-manipulation provision always applies. And how could this be remedied? Let's say that we remanded to FERC and said, look, sort out FCA 8. Sort out what implications, you know, if you find market manipulation, what implications that had for 9 and 10. Then what do you envision could or would happen? The plant is closed. In fact, Capital Energy Partners has sold it. How does FERC unravel this? One option is they look at what the plant's cost would have been to run, and they do the proxy. And these prices don't kick in for 9 and 10, and they don't start until June of this year, and they go this year and the next year. And they recalculate the price. Your Honor, I mean, that's a straightforward solution, which we believe ought to happen here, and that the price would then be determined to be just and reasonable. FCA 8 prices are already kicked in. Last year? They're only for a year, so they are being collected right now. And they are up in the air because of the public citizen decision and FERC's deadlock in that proceeding where they made no determination whatsoever. And they've done nothing since. They haven't, and we filed an amended protest. They were deadlocked because of the 2-2 split. The composition changed. That deadlock was broken, and we filed an amended protest that said, now decide under 205 whether these are just and reasonable, and that's been pending. And FERC has done nothing. It's a real tight situation because we have that, and on the other hand, the public citizen's case that says you can't appeal anything that's been done. Right. Why don't we hear from FERC, and we'll give you some time on that. Okay. Thank you, Your Honor. Thank you. Thank you, Your Honor. It's Ross Fulton for the commission. I think there's two primary issues with standing, if I may. The first is the link to the auctions themselves. As was discussed earlier, the tariff and the commission's precedent links each individual auction as its own separate entity. So the retirement in the eighth auction has no impact on the retirement in the ninth and the tenth. And I would analogize it to at the pleading stage in district court, where you do have to take factual allegations or presume them to be true, but you do not have to presume that allegations that are contradicted as a matter of law are true. And I would even compare it to the proxy that petitioner would like to have been used. Even using that new market design rule, which was not available at the time, that proxy would have only applied in the eighth auction. The commission has no authority to continue to apply that proxy. And in some ways it makes sense because the commission presumes it's a market. So if prices are higher because of reduced supply, the goal is to get new suppliers into the market, which is what, in fact, the commission found has occurred here. So in designing an auction, there is no base factor of prior costs and revenues? There's not, Your Honor. It's literally starting with a blank slate? That is my understanding, yes. Other than the fact that the auction's intent is if prices are higher in one auction, the subsequent auctions should reflect new supply entering the market, which is, in fact, what's happened in the New England system. In fact, they just released the results of the latest auction yesterday, which the price continues to enter the market since this eighth auction. But you're not sure? No, I mean, yes, I am sure. But you said you thought. I'm sorry. I said my understanding. I did not mean to couch my answer. Sorry, the word. The auction does not take into account retirement. Any private enterprise is permitted to retire. The auction has a system for handling that, and as the market monitor found in the ninth and the tenth auction, when they took into account the entrance of new supply, along with how the market monitor mitigated exit bids, that those results were a competitive auction in the aggregate, and that's just as reasonable. But I think the economic case that petitioners would make is that if FERC was on top of it, you know, looking at it through their lens, if FERC were on top of it at FCA 8, they wouldn't have examined and not approved or taken measures in view of apparent manipulation with the proposed withdrawal. And Energy Capital Partners, facing once the opportunity to profit in the rest of its portfolio was eliminated by mitigation measures, might not have actually withdrawn the Brayton plan. So I take their case to be factually require, you know, challenging expert proof, but not legally deficient for that reason. In other words, you know, if they're right that there was market manipulation, and if they're right that FERC had an obligation at the time to mitigate that, and if that were clear to Capital Energy Partners, might have thought, well, our clever idea of, in their view, of making a lot of money in this part of our portfolio by prematurely closing down this other part isn't such a good idea after all, and it might be the case that Brayton plan would have been online as of FCA 9 and FCA 10. Do you have a response to that? And, of course, Mr. Spencella can correct me if that's not the argument they're making. No, I understand. I think there's a couple points. One, the issue of market manipulation is not before this court. In fact, this court in public citizen observed in footnote 2 that the commission had, although Brayton Point was not the subject of the investigation in market manipulation in the eighth auction, the commission's enforcement staff nonetheless looked at Brayton Point and found credible reasons for its retirement and then found there was no further reason to investigate. And that was, as this court found, those kind of enforcement decisions are subject to the commission's discretion. Right. Maybe that's using a shorthand, but their factual case is that they're not saying, oh, we're second-guessing your enforcement decision. They're saying we're second-guessing your failure to do a rigorous just and reasonableness determination, and what underlay these prices was exercise of market power. So perhaps I'm leading us down the wrong road by referring to it as market manipulation, but non-just and reasonable prices. And if the commission had recognized the problem and said we can't approve this because these prices will not be just and reasonable, we need to do some market mitigation, maybe we'll use a proxy, we'll do something to keep the price from, the clearing price from being unreasonably high, then that would have perhaps affected the strategic decisions by capacity. I think there's two points to that, Your Honor. The first, with just regard to the Auction 8, as we describe in our brief, the BrainPoint made an exit bid. The market monitor did, in fact, mitigate that bid. As permitted under the tariff, BrainPoint decided rather than take that mitigated bid, it chose to retire, which it's permitted to do. And neither the system operator nor the commission can force a private plan to stay in business. So that's Auction 8, which is, of course, not before this Court now. With Auction 9, BrainPoint has obviously been retired. The market monitor and the system operator's other testimony that it submits is looking at the market as a whole. And what Petitioners never quite explain is why the lack of one particular supplier automatically renders the market in the aggregate not just unreasonable. Because what the market monitor found is when it looked at the totality, particularly the number of new suppliers that entered the market and stayed through the multiple rounds of the auction, in combination with the market monitor's mitigation of the exit bids, that there was adequate supply in the market in total to result in a competitive auction. But the monitor in the reports on FCA 9 and FCA 10 assumes the validity of the FCA 8. And I think the petitioner's position is, no, that wasn't valid, and it wasn't valid in ways that have a bleed-over effect on 9 and 10. I mean, the FCA 9 and 10 orders that are before us now do quite directly rely on what happened in FCA 8. And I guess I'm not even sure. To me, I'm struggling with how that works in an economic sense, because let's even just, for purposes of this, assume that Brady Points retirement in Auction 8 was an attempt at market manipulation. So Auction 8 happens, they commit a market manipulation. Auction 9 comes around, Brady Points retired. A bunch of new suppliers, regardless of why Brady Point retired, see, this auction had a high price. We're going to enter it to try to make money. Right. These are all factual questions. And the problem is we don't have something from the commission spelling that out. Well, I think that the commission – It's for FCA 8. There's just nothing. But that's because FCA 8 is not before this court. Except insofar as it has an effect on FCA 9 and FCA 10. And the FCA 9 and FCA 10 orders say, and there was no manipulation, and rely on a clean bill of health with respect to FCA 8. But that seems to beg the question, no? I guess – I thought you were saying assume the worst happened in Auction 8. There's just no basis that that would contaminate Auction 9 and 10. Yes, that is my contention, because each auction is distinct. And I don't quite get how the bleedover would have an effect, because, again, we're talking about supply from a whole host of places. And so the entrance of new suppliers negates any concern. So, again, take what the petitioners would like as the remedy, which is to use the new market design as a proxy in Auction 8. Again, even if that had been done in Auction 8, that doesn't have any impact on Auctions 9 and 10. It might alter the price in Auction 8. But wouldn't it have, for the reason that I was suggesting? I'm not sure that I know what your position is on that. Had FERC promptly said, ooh, we're going to use proxy pricing here, and eliminated the opportunity for Energy Capital Partners to make as much money as it did on the balance of its portfolio, might it not have made a different decision with respect to Brayden Point? I mean, I guess we can just – I mean, that's quite an assumption. Well, it's an economic matter. Somebody could spell that out. And as I said, both this Court and Public Citizen observed, and as the Commission discussed in footnote 35 of the initial order, the Commission, in fact, investigated the reasons why or took an initial look at the reasons why Brayden Point retired and found credible reasons that had nothing to do with market manipulation to retire. Those aren't in the record, though. Is there any obstacle to FERC disclosing some version of that thinking as support for a determination whether capacity prices resulting from FCA 8 were just and reasonable? I mean, I recognize that enforcement decisions and underlying thinking aren't themselves generally made public, but given that FERC does have an obligation to make a just and reasonableness determination, couldn't it do what effectively you're doing standing here today and say, well, look, we've looked into that. We have reason to think that this was not what happened. Here are the reasons. And you do some of it in your brief. We just don't have anything in the record. I think the Commission does try to do it in the record. As I said, in the initial order in Option 9, the Commission says, for all these reasons, we find this market was just and reasonable. In addition, enforcement looked into this issue, found credible reasons for this retirement. But that's just a conclusion. But it's an enforcement, it's a discretionary decision. To be sure, so I think the petitioners here are not saying we question your enforcement decision, qua enforcement decision, but there's a separate legal obligation, which is the just and reasonableness obligation. So if there's some economics or some thinking about market operation that underlay that, it's a matter of your just and reasonableness responsibility. And I think, again, I would say the Commission saw Option 9 as completely distinct. And the reason the Commission saw it as just and reasonable is because, just for assumption, let's say there was 100 suppliers in the market. Whether Brayden Point as the 101st supplier would not have made a meaningful difference to the competitiveness of the marketplace once you took into account the new suppliers that entered the market in Options 9 and Options 10. Can I ask you something that I just don't know? In Auction 8, the ISO ended up using the administrative pricing because it was found to be a noncompetitive auction. And this may just be unanswerable. Is there any evidence in the record that use of the proxy system that's been adopted going forward would have had a material difference from the administrative pricing rules that were used in Auction 8, or would they both sort of end up at the same place? There's nothing in the record, Your Honor. And obviously, the Commission didn't consider it because under Section 205, its subsequent market changes don't have bearing on its previous. I'm just trying to understand whether the proxy system... Yeah, I mean, this is just totally my sort of reading what happened. I don't think there were so many retirements that year. It doesn't seem like one proxy would have made a difference, maybe, in total. But obviously, the administrative pricing rules, in addition, were designed themselves to serve as a proxy for a competitive auction. Let me ask you just a legal question. Imagine that Auction 8 came up to the Commission, and they said, oh, this doesn't look good to us. Yes, sure. Could they, without an amendment to the tariff, have said, this is unjust and unreasonable, go do this proxy thing to make it right? Or would they have been limited to simply saying, this is unjust and unreasonable, and would ISO itself have been able to use a proxy system without an amendment to the tariff? Could the proxy system have been used without an amendment to the tariff? No, Your Honor. The market design rules are separate from the Commission's consideration of the outcomes in these 205 just and reasonable proceedings, which is why, as we see here, the change is made separate from any particular auction, because the rules are set in place, the architecture, if you will, is set in place, and then the actual auctions are conducted under. So if Auction 8 had been found to be unjust and unreasonable, just assume because Brayton Point, Brayton Point, they'll find, was the cause of the problem, assume that, and assume it's because of market manipulation, assume the worst. If FERC had said unjust and unreasonable, what could ISO have done? Or what could be done to remedy that, given that they'd already done the administrative pricing and they couldn't do a proxy system because the tariff didn't allow for it and were very strict on deviations from tariff? So what could have been done? It's a good question. I'm not entirely sure. I presume that the – I think the commission can have the system operator rerun the auction, and obviously they could change it. It's – But that couldn't have – I mean, that presumably would have happened before the actual year of service, but we're now, I think, aren't we now in the middle of the year from Auction 8? So could it be done now? Or what would they do under an 8-24? Yeah, so with Auction 8, this is – I mean, it's obviously, it was a unique, rare situation where there were four commissioners and there was a 2-2 tie. And, you know, as this court observed in Public Citizen, that this is just – this is how Congress created the Federal Power Act. And there is, in fact, legislation to address this issue, and as the court said, that's the proper form for it. A petitioner can always bring a Section 206 case. I'm sorry, there's legislation to address which issue? A commission deadlock. Oh. And to provide the ability to change rates after the fact. But I don't know what – I don't know if an 8-24E proceeding would change this problem. Well, I mean, the reality when there's a 2-2 tie, it may not. Now, it could be brought later. But the Federal Power Act is set up under Section 205 to not provide the ability to alter rates after the fact. A lot of the – you know, and obviously, again, a lot of this focus remains on the eighth auction and a lot of the – But in ISO 9, ISO New England's experts noted that there was insufficient capacity in southwestern Massachusetts in the Rhode Island zone, and that's exactly the area that the Brayton Point plant served. Isn't that also evidence to support petitioners' claim of injury due to the retirement? No, Your Honor, because the commission, again, has set up these market rules where the administrative pricing is a proxy for a competitive outcome. So the – because – I mean, I know that we're continuing to get held up on the fact that Brayton Point is allowed to retire. And so even if in Auction 8, again, if we had used the – even just assuming we could use the commission's new – the system operator's new proxy rule, even if that had been used in Auction 8, Brayton Point still would have been retired in Auction 9, and the same – there would have been a new supplier into the marketplace. I know that Your Honor has posited that perhaps they could have, you know, produced evidence that they would have stayed in the market if the commission had done something in Auction 8. Again, none of that was presented to the commission at the time when the commission was considering whether these auction results were just and reasonable in Auctions 9 and 10. And our standing rules don't usually let petitioners rely on the predictive actions of third parties, not before the court. So wouldn't that be the difficulty with that approach? It would be, Your Honor, but again, the, you know, economic modeling that petitioners referred to that was not before the commission would have at least been some attempt to provide evidence. The commission reviewed the entire record before it, and again the system operator presented four pieces of testimony, including the market monitor, the auctioneer, who all found it. What I'm curious about on this notion of this expert testimony sort of coming in now, on the one hand, you know, we need to be able to establish standing for purposes of our jurisdiction. On the other hand, to the extent that causation showing would swap over into a merits showing as to whether Auction 8 affected Auction 9, it seems to me that couldn't be done at this stage, right, or without a remand to FERC because they chose not to make that causation showing before FERC, and you haven't had any chance to respond to it. Yes, no, I agree, Your Honor. Your Honor, the standing issue aside, the merits that the petitioners cannot introduce factual evidence that the commission couldn't consider and consider a remand. Now, the petitioners, I suppose, could file, again, bring a Section 206 complaint, introducing its new evidence and claiming that what the commission has decided were just and reasonable are now somehow unjust and reasonable. The burden issue here is a little bit tricky. I mean, they have a burden to establish their standing, but I think their point is that the burden is on FERC to, and they're basically just saying, look, we've got some numbers here, and, you know, you can respond by disputing those numbers. You can respond, you know, by saying other things caused them, but all we're doing is saying to you, you have a duty that you haven't fulfilled. And so the whole idea that they have to chapter and verse disprove what they think it's actually FERC's burden to establish, which is that the rates were just and reasonable, I don't know why they would have to do more than sort of lob that ball into your court and say, you know, come on, guys. Well, I agree that it's the system operator's burden to prove it's just and reasonable. I disagree. I mean, I don't think there was even a ball lobbed into the court, but that said, the commission here, what it relied upon was the testimony provided by the system operator regarding the competitiveness of the option, and it found that that testimony constituted substantial evidence that there was a just and reasonable outcome. Now, the commission itself noted, in addition, that there was no evidence provided to the contrary. That may not have an impact because it's ultimately, as you said, the burden, but the commission, that was just sort of a side point. The main finding, obviously, is based on the entire record presented. So ultimately it's the burden of the commission, but it's your view that the commission has met that burden in the orders? Yes, Your Honor. And what about this amended reconsideration petition by petitioners here with respect to FCA 8? That's been pending a long time. What's the status of that? I'm not certain, Your Honor. As I said, there was actually recently just congressional testimony regarding the change to the rule, and as was pointed out, testimony of a petitioner, whether it's the union or anyone else, could still bring a Section 206 complaint regarding the eighth option. But they have pending a Section 205 is what I'm asking about. I understand there was a deadlock, and then there was a petition by this court saying not yet final, and it seems to remain not yet final? The commission's position, which was upheld in the public citizen, was that those rates took effect by operation of law, and so for the eighth option, those rates were established. Is it your position that when rates are established by operation of law in that manner, that that just dispenses with the obligation of the commission to assert, to affirm that they are just and reasonable? Well, by yes and no, by operation of law means that it becomes just and reasonable. That said, again, a party could challenge that. I mean, this court in public citizen already upheld that those went into effect by law, and obviously that option eight is not before this court right now. I understand the concern that, and it was, you know, the express and throughout the public citizen proceedings too, that this unique situation where there was a 2-2 deadlock didn't have a commission order on the issue. So is your answer, I mean, there is a pending reconsideration petition, and is your position that it would be lawful for the commission to just say that is QED just and reasonable because it went into effect by operation of law? Yes, my answer would be that that became just and reasonable, but that a party is always able to challenge those. I guess I would say the proper way just to me to challenge that would be to bring a Section 206. I understand the Section 206 is available, but how could it be that what this court held was not an action of the commission, was not an action of the commission, was a determination by the commission that the rates were just and reasonable? Because the Federal Power Act made it so. But it said nothing about those rates that are deemed just and reasonable. It said that the rates go into effect. Right. So they're effective. So to challenge an effective rate, it's a Section 206. So once a rate goes into effect, even if they're pending 205 proceedings, they just evaporate and you have to go to 206? Yes. Really? Well, they're not pending 205 proceedings. The 205 proceeding ended with the 2-2 deadlock that led to those rates going into effect by operation of law. So that ceased, which is why it was appealed to this court and why this court issued public sentencing. All right. Anything else that you want to alert us to? No. I mean, we've been focused on the threshold point. We've gotten off into the merits a little bit here. Yeah. Yeah. If you don't mind, Your Honor, if I could just touch. I brought up the first point of outstanding about the linkage to each auction. The second point is, again, it's wholly speculative. I know Your Honor spoke about allowing a supplemental finding. I mean, you know, the burden may not be high, but there has to be some sort of. No, I think we understand that. Yeah. And the only final point I would make regarding, you know, again, there seems to be a lot of focus on manipulation. The only issue before this court is the commission's determination that auctions 9 and 10 were just and reasonable. To the extent the focus is a market manipulation claim, that is not before this court, and it would be subject to the commission's discretion. All right. Thank you. Thank you, Your Honor. All right. Counsel for Petitioner will give you a couple of minutes here. Thank you, Your Honor. My friend's suggestion that market manipulation is not before the court just misses the boat entirely. The essence of what determines whether these results in FCA 9 and FCA 10 were just and reasonable is whether or not, given the indicia of this shutdown of this plant by a fleet owner, whether that constituted market manipulation. And that is essential. If we just assume, answer this question, assume there was no market manipulation at Auction 8, just assume that, and just retire it and nobody wanted to buy it, all right, assume no market manipulation, then would you dispute that the auctions in 9 and 10 were otherwise competitive? Your Honor, I don't think we would dispute that given the facts that we know. You would not dispute that they're competitive if we assume no market manipulation? If you assume that this was not the result of market manipulation or the exercise of market power by a fleet owner. And that would turn on the economics, among other things, on the economics of the plant, whether this plant could be run profitably or not, and they shut it down anyway to drive down prices. That's not allowed. I get you're arguing market manipulation again, but if we assume no market manipulation, then you've got no challenge to Auctions 9 and 10.  And then given that FERC has found no market manipulation, its enforcement office has found no market manipulation, at least for a meriting enforcement action, how do we get past that? All that is is, one, a conclusory statement, just that. Well, we don't ask people to open up their investigative enforcement files and put them out there for us, really. Correct. If you're reviewing the decision not to take enforcement action under Section 222 and impose penalties, and we're not asking for enforcement action and imposing penalties in this case, we're saying that if there's market manipulation, that the results of the auction are not just unreasonable. And determining whether or not there's market manipulation, there's got to be, in this case, in this record, there has to be an examination to determine whether there was market manipulation in order to determine whether the results were just and reasonable. And if FERC wants to rely… But then you accept that you have to show not only that there was market, you have to independently show, to render these rates unjust and unreasonable, you have to independently show both that there was market manipulation in Auction 8 and that that carried forward to taint both of these proceedings. Correct? Yes, Your Honor, although I would say the burden is on ISO New England under Section 205 to show that they were… But they've given explanations as to why they think it was just and reasonable. You said it was competitive. Your predicate is that there was market manipulation. They say we don't think there was market manipulation. So it seems then to me they did their job, and they admitted what their burden was, and it's shifted to you to show you're wrong. You're wrong. There was market manipulation, and that market manipulation tainted them. Your Honor, I would submit that they haven't done their job of determining whether, in light of these indicia, whether there was market manipulation. There's no evidence in the record regarding the profitability that the plant could not be run profitably. There's nothing. FERC doesn't examine that. They say it's irrelevant. Is your position that if it could have been run profitably, ipso facto it was market manipulation to retire it, or does something more have to be shown? In this circumstance, when it's shut down by a fleet owner that jacks up prices and his profits, that is market manipulation if the plant can't be run profitably. If the plant can be run profitably. It's automatically market manipulation, even if they had perfectly legitimate reasons for retiring that plant. Your Honor, it appears to be market manipulation, and FERC needs to examine and determine whether or not there was given all of that. And one part of that might be an examination if there was a legitimate reason to shut this down, but there was no examination by FERC in this case of the reason for shutting down. Do you have any case or authority that says if it was still economical to run, the shutdown is presumptively or prima facie manipulative? Yes, Your Honor. We cite FERC's statements, FERC's own statements, and that we refer in the brief. I want to make sure we get the right reference, which I'll give you in a minute. But where they say in a series of cases that if someone shuts down, takes an uneconomic action with respect to one asset, in order to increase the price they'll receive on another asset in the market. In order to suggest an intent, right? And that's what, right? You can't, my question wasn't, you weren't making any allegations about intent. You were simply saying if this shuts down and it objectively has this effect over here on other businesses, it is presumptively or prima facie manipulative. But the in order to that you just said requires mens rea. Do you have any evidence of mens rea? We believe the circumstances are very indicative of mens rea and that there was intent. When somebody comes in and buys a plant and then immediately shuts it down and the prices increase and the buyer makes a huge profit on all his other generation assets, that's prima facie indicia that there may be market manipulation and that it was intentional. All right. Thank you. Thank you. We will take the case under advice. Thank you, Your Honor. And I would like to submit a, if the Court would like, a supplemental affidavit by Mr. Chernick, which he will confirm the determination of the price increases in 9 and 10, which are in our brief. At this point, let the Court confer and if we need something further from you, the clerk will notify you. Thank you very much. Thank you.
judges: Rogers, Millett, Pillard